MAHONEY, Respondent, vs. KENNEDY and another, Appellants.

*September 25—October 20, 1925.*

*Evidence: Admissions: Failure to answer letter: To reply to oral statements: Instructions: Prejudicial error: Singling out or omitting evidence offered by either party: Res gestæ: Hearsay: Statements of third party after event.*

1. The ordinary rule is that when a letter is written making such a claim as in common experience would naturally be denied by the addressee, or where it is his duty to reply, the letter and the failure to reply thereto are admissible in evidence. p. 40.

2. The same probative effect is not necessarily given to the failure to reply to letters as to oral statements in the presence of a party, as various circumstances, like want of facility in writing, habitual delay in correspondence, or press of business, may lead to the conclusion that silence is not acquiescence. p. 40.

3. An instruction that the silence of a party when a statement is made to him, in a letter or orally, which he would naturally deny if false, may amount to such an admission thereof as to justify a finding of its truth, is erroneous where not accompanied by explanation, caution, or reference to other proof tending to explain the situation. p. 41.

4. An instruction that a person's unexplained and "ambiguous" acts and conduct inconsistent with his words or claimed intent or understanding are generally a more reliable guide as to his intention is not prejudicial error, though the word "unambiguous" was doubtless intended to be used.   p. 42.

5. An instruction that if defendants, after the date of an alleged contract by them to purchase plaintiff's stock in a corporation, proceeded as if they had succeeded to plaintiff's rights as stockholder, officer, or manager of the corporation, such conduct should be considered in determining whether the alleged agreement was made, is erroneous as unduly emphasizing plaintiff's evidence and ignoring defendants' evidence that they did not so proceed after such date.   pp. 42, 43.

6. An instruction to consider plaintiff's conduct in canceling his checking signature as treasurer of the corporation, notifying defendants thereof, and any other acts done by him to their knowledge in the way of relinquishing his rights as a stockholder, officer, or manager of the corporation after the alleged sale of his stock to them, is error as unduly emphasizing plaintiff's evidence and not alluding to circumstances corroborating defendants' contention that no such contract was made.   pp. 42, 43.

7. Testimony as to a statement by the assistant manager of the corporation, after the alleged sale, that "I am monarch of all I survey," is inadmissible on the issue whether a contract of sale was made, as pure hearsay and no part of the *res gestæ*, though brought out to corroborate the plaintiff's and the manager's testimony.   p. 44.

8. In an action for the purchase price of corporate stock, ·the issue as to whether the stock was delivered and accepted should be submitted.   p. 44.

APPEAL from a judgment of the circuit court for Walworth county: E. B. BELDEN, Circuit Judge.   *Reversed.*

For the appellants there were briefs by *George G. Sutherland* of Janesville, attorney, and *Jeffris, Mouat, Oestreich, Avery & Wood* of Janesville and *H. L. Butler* of Madison, of counsel, and oral argument by *Mr. Butler* and *Mr. Otto A. Oestreich.*

For the respondent there was a brief by *Edward H. Ryan* of Janesville, attorney, and *Grady, Farnsworth & Walker* of Portage, of counsel, and oral argument by *Mr. Walter H. Farnsworth* and *Mr. Ryan.*

JONES, J.  This is an action for the purchase price on an alleged contract of sale of shares of stock in the Janesville News, a newspaper which was published for a short time in that city.  At the time of the transaction involved the plaintiff was a lawyer residing in Portage, defendant *Burns* was a merchant, and defendant *Kennedy* a real-estate dealer, both residing in Janesville.  In the summer or early fall of 1919 there were negotiations between the plaintiff and the defendants with respect to organizing a corporation to publish a newspaper to take the place of one which had suspended publication.  A new corporation was organized September 19, 1919, with $20,000 authorized capital stock, but no certificates were issued prior to the alleged contract.  It was agreed that the plaintiff should hold a majority of the stock and he subscribed for $10,000 and paid in $5,000. Other stockholders, including the defendants, subscribed for stock and paid in $3,085.  There was testimony that the plaintiff also paid at a later time some money for expenses.  He was elected secretary-treasurer and manager, and J. E. Jones, also of Portage, became assistant manager. The plaintiff managed the affairs of the corporation up to November 20, 1919, and the defendants seemed to take no part in its management.

A short time before November 20, 1919, the plaintiff indicated that he desired to sell his stock and advertised his interest for sale.  Differences had arisen between the plaintiff and Jones, and there was testimony to the effect that the plaintiff told him to resign.  A meeting was arranged between the plaintiff and the defendants for the evening of November 20, 1919, at the offices of *Kennedy.* At this point there is an irreconcilable conflict between the testimony of the plaintiff and of the defendants.  There was considerable testimony as to what occurred at this meeting, but the substance of the plaintiff's testimony was that a contract of sale was made in which the defendants agreed to purchase his interest for the sum of $7,000, to be paid

within two weeks. Both of the defendants denied that any such contract was made, and gave it as their version that they refused to buy and only stated that they would present the subject to the stockholders for their action at a meeting to be called for that purpose. In corroboration of the plaintiff, Jones testified that before November 20, 1919, he had a talk with the defendants, in which talk they said that they would purchase the plaintiff's interest provided he would accept what he put in; that he told the defendants he would resign and would not consider staying with the plaintiff in the management of the office; that the result of the discussion was that the only way to get rid of the plaintiff was to buy him out; and he further said that they came into his office after the meeting of November 20th and told him he would have no further trouble with the plaintiff, as they had bought him out and had paid $7,000; that he could go on and run the paper for the best interests of the newspaper.

On November 28, 1919, the plaintiff wrote a letter, a part of which was as follows:

*"Friend Burns:* Mr. J. E. Jones was in town yesterday and seemed a little worked up over matters at Janesville connected with his relationship to things there. I assured him that everything was all right. The morning after you and *Mr. Kennedy* bought my interest in the paper, which was on the evening of November 20th, and before I departed for home, I told Mr. Jones about this affair, and he told me that you folks had told him the same thing, all of which I verified. I told him that the policy of the paper and everything connected with it was in your hands and that he was to take his directions from you folks in the future. Of course, I told him the same thing yesterday. He said that he thoroughly understood that part of it, but he did not seem to feel secure in anything, although I told him that he had no reason whatever to believe that there should be any change whatever in his relationship to affairs as far as I knew or had any reason to believe."

It was a long letter, in which the plaintiff discussed the

former management of the paper and gave some advice as to its future management. At the end of the letter he added:

"I have notified the First National Bank that my checking signature as treasurer should be canceled and that my place in that regard has been taken over by *J. E. Kennedy* and *T. P. Burns* and that their signatures should replace my signature as treasurer. I am sending a letter of like import to *Mr. Kennedy.*"

The plaintiff testified that he wrote a similar letter to *Kennedy*, who testified that he did not receive it and that the first time he saw such a letter was when *Burns* showed him, at a later date, the letter which he had received. *Burns* admitted receiving this letter, but stated that he regarded it as too ridiculous to answer. On December 8, 1919, the plaintiff wrote *Burns* another letter, in part as follows:

"*Friend Burns:* As you will remember, when I sold my interest in the News Publishing Co. to you and *Mr. Kennedy* on November 20, 1919, for $7,000, you both expressed the wish that you might be given a couple of weeks in which to make payment, and that I consented to this. The time has now expired by some days and I have to make preparation to pay quite a sum of money on the 16th of this December, and I have written *Mr. Kennedy* that, unless you folks would sooner make payment in some other way by that time, I would make a sight draft for the amount payable December 15th. Let me know your wishes in regard to the matter of making payment as soon as you receive this."

The remainder of the letter congratulated him on the apparent prosperity of the newspaper. *Kennedy* received a similar letter, and he then went to the store of *Burns* and showed it to him, and according to the testimony *Burns* said he had got two of these letters and showed him the former one, which *Kennedy* then read. *Kennedy* then wrote to the plaintiff the following letter:

"Dear Sir: Your letter of December 8th is at hand and contents fully noted. Upon reading your letter I find that you state you sold your interest in the Janesville News Pub-

lishing Company to *Mr. Burns* and myself, which statement is not correct.

"You will recall coming to my office the morning after *Mr. Burns* and I told you that we would try and get the other stockholders to take over your interest, and you wanted me to sign a contract to the effect that we had bought it, but I told you that I would not, and that we could do nothing until we called a meeting of the stockholders, which we have done, and some are in favor of buying and some are not, and up to date we have not raised enough money to pay you in full; but as soon as we do I will let you know.

"Yours very truly,       J. E. KENNEDY."

The plaintiff then wrote to *Kennedy* as follows:

"Dear Sir: Your amazing letter of the 10th inst. only reached me a few moments ago. You know that every statement concerning the sale terms made in your letter is deliberately untrue. I shall make the draft as stated in my letter of December 8th inst.

"Yours truly,       J. L. MAHONEY."

On November 28th the plaintiff had written the First National Bank of Janesville stating that he had sold all his interest to *Burns* and *Kennedy* and that they had become the owners of all his interest; that since November 20th he had not signed any checks and would not in the future. The bank was asked to cancel his signature in connection with the corporation and it was authorized to put *Burns* and *Kennedy* in his relation to the deposit and checking accounts; that he had advised them of his action; that so far as he was concerned this would not interfere with the right of Jones to continue to sign checks.

Cora O'Brien, clerk in the office of *Kennedy*, testified to a conversation between the plaintiff and *Kennedy* in *Kennedy's* office, in which the plaintiff said he had a memorandum for him to sign. When asked what it was he said it was the memorandum of the sale of his stock to the stockholders which they had talked over the night before; that *Kennedy* replied that he would not read nor sign it, but

that they would call a meeting of the stockholders and let him know what they had done; that the plaintiff replied that they would consider there had been nothing done for the sale of his stock, and *Mr. Kennedy* said that would be all right. The testimony of *Kennedy* was substantially the same. The plaintiff denied that he was in the office of *Kennedy* on the morning of the 21st and denied that this conversation took place. Two witnesses testified to a conversation with *Jones,* who, in reply to a question as to whether the plaintiff had sold his interest, said that *"Mr. Mahoney* told me that he had sold out to *Kennedy* and *Burns,* and I told *Kennedy* and *Burns* what he said and they told me there wasn't a word of truth in it."  Another witness testified that he had a conversation with the plaintiff in the evening on or about November 20th, in which the plaintiff said he had seen *Kennedy* and *Burns* in regard to selling his interest in the paper and they were going to call a meeting of the stockholders.

After the date of the alleged sale *Jones* continued in the management of the paper and continued to draw checks. There was a meeting of the stockholders about two weeks after November 20th for the purpose of ascertaining whether the stockholders would buy the plaintiff's stock, the minutes of which were kept by Judge Maxfield. After November 20, 1919, neither the plaintiff nor the defendants seemed to take any active part in the management of the paper, but on January 26, 1920, a meeting of the stockholders was held and *Burns* was elected secretary-treasurer. After that time he signed checks for wages, and it was talked over with the stockholders and found necessary to borrow money while the paper was running, for a few weeks, and *Burns* and *Kennedy* indorsed some notes.

The contract of sale alleged to have been made on the evening of November 20th was by parol, and it was one of the issues whether there had been sufficient part performance to take the case out of the statute of frauds.  There was a

general verdict in favor of the plaintiff for $7,000, on which judgment was rendered for the plaintiff for this sum with interest and costs, and from this judgment the defendants have appealed.

The principal assignments of error relate to the instructions given by the court and the reception of evidence. Counsel for the appellants emphasize their objection to the following instruction:

"A certain letter from plaintiff to defendant *Burns*, the contents of which was communicated to defendant *Kennedy*, has been received in evidence. It appears that no answer was made thereto. In respect to this you are instructed that admissions may be implied from the failure of a party to reply to statements in a letter of which he has knowledge and which if not true he would naturally deny. The silence of a party when a statement is made to him in a letter or orally, which if false he would naturally deny, may amount to such an admission thereof as to justify a finding of its truth."

While it is literally true that the contents of this letter to *Burns* were communicated to *Kennedy*, the instruction is so framed that it may well have been understood that it was communicated at once, while according to the testimony it was not brought to the attention of *Kennedy* until about ten days after it was received by *Burns* and when another letter had been received by both *Burns* and *Kennedy*. While *Kennedy* did not reply to that letter for the reason, as he stated, that he never received it, he did reply, according to his testimony, as soon as the plaintiff's claim came to his knowledge. The following decisions of this court are cited by counsel for the respondent in support of the instruction excepted to: *Kimball v. Post*, 44 Wis. 471; *Murphey v. Gates*, 81 Wis. 370, 51 N. W. 573; *Moller v. J. L. Gates L. Co.* 119 Wis. 548, 97 N. W. 174; *Ott v. Cream City S. Co.* 166 Wis. 228, 164 N. W. 1005. In the first of these cases there was a direct oral demand for the possession of a piano and a refusal to give it up. It was held that the re-

fusal to deliver it, without any explanation or disclaimer
of having the possession, was an admission that the defend-
ant had it and sufficient to sustain the action.  In the second
case the action was by an attorney for services.  He had
written several letters containing an account for his services,
calling attention to the contract and asking payment.  The
defendant made no reply.  It was held that the failure of
the defendant to respond was a tacit admission of the claim.
The third case was an action for payment of services.  The
plaintiff from time to time during his service rendered state-
ments of account to the defendant's officers, who with full
knowledge of the plaintiff's claim gave no intimation that
they had a different understanding and for about eighteen
months encouraged the plaintiff to continue his services.
This was held an estoppel.  The last case above cited was an
action for the price of groceries and meats delivered to the
defendant. From time to time bills and statements had been
sent to the defendant showing the exact items and balances
of the running account for each month.  Statements had
been sent for the months of May, June, July, and August,
and the last was sent October 27th.  Payments had been made
from time to time and the statements had been retained with-
out objection.  The defendant's attention had been called,
in July or August, to the fact that there might be the falsifi-
cation in the account which was pleaded in the answer.  It
was held that this conduct, in the absence of any evidence to
the contrary, might have been held by the trial court con-
clusive evidence of the correctness of the account and the
delivery of the goods.

The appellants' counsel cite the following cases among
others: *Hinton v. Wells,* 45 Wis. 268; *Valley L. Co. v.
Smith,* 71 Wis. 304, 37 N. W. 412; *Rose v. Bradley,* 91
Wis. 619, 65 N. W. 509.  The first of these cases was an
action for a broker's commission.  There was evidence
that the defendant had stated in the presence of the plaintiff
that he was to pay no commission and that the plaintiff

made no reply. The court was asked to instruct the jury that under the circumstances the silence or neglect to deny was to be considered as evidence to establish the truth of the defendant's statement. It was held that it was not error to refuse the instruction; that the fact that the plaintiff did not contradict the statement was a circumstance, perhaps, of some significance and could properly be considered, but it would at most only tend to prove the truth of defendant's claim and was not evidence to establish it. In the second case the issue was whether the plaintiff was entitled to $200 for the use of a logging camp. There was evidence that the bill had been presented to the defendant and that no objection was made and the bill was kept. The trial court gave the following instruction:

"Where a statement of account is rendered, and nothing is said about it, and no objections made, of course that is *prima facie* evidence of the correctness of the bill. It is a sort of admission on his part of the correctness of the bill." *Valley L. Co. v. Smith*, 71 Wis. 304, 308, 37 N. W. 412.

In the opinion by Mr. Justice ORTON it was said:

"Aside from the fact that this claim is not a matter of book account, or of an account rendered or bill presented, but the subject of a special contract, and such a principle of law has no application to it, it was unfair for the court to ignore or suppress the testimony of the defendant Smith that he did at the time object and insist that he had never hired or rented the camps, but that he had bought the forty acres, with the camps upon it. The jury might forget that evidence, and from this charge of the court take it for granted that the defendants had assented to the claim by not objecting to it, and might have been, and probably were, thereby misled as to the evidence."

In a comparatively recent case by the supreme court of Massachusetts it was said:

"The rule is well established that a person to whom a letter is addressed ordinarily is not required to make any reply;

and failure to answer it is no evidence of the truth of the facts therein stated, because such evidence would be in violation of the rule that a party cannot make evidence for himself by his own declarations." *Kumin v. Fine,* 229 Mass. 75, 118 N. E. 187.   See, also, numerous cases collected in 8 A. L. R. 1163.

Although this may be said to be the ordinary rule there are exceptions, and when a letter is written making such a claim as in common experience would naturally be denied by the addressee or where it is his duty to reply, the letter and the failure to reply are admissible in evidence.   It was so held when this case was here on a former appeal.   In the opinion by Mr. Chief Justice Vinje it was said:

"Letters passing between the parties after the contract is alleged to have been made and prior to the commencement of the action, stating the claims of the parties as to the existence of the contract and its contents, should have been received in evidence as tending to show the claims or admissions by silence or failure of denial of the parties." *Mahoney v. Kennedy,* 172 Wis. 568, 572, 179 N. W. 754.

Counsel for the appellants do not argue that the letter in question was improperly received, but they do strenuously object that the instruction gave to the failure to answer the wrong probative effect.   There are innumerable decisions relating to the effect to be given to the failure to respond to oral or written communications, and it would be impossible to reconcile them, partly because of the infinite differences in the facts on which the cases were decided, and partly because the courts have often treated communications containing accounts like other communications.   Of course, different rules apply to the two classes.   It does not necessarily follow that the same probative effect is to be given to the failure to reply to oral statements made in the presence of a party and to such failure to reply to letters.   In the former case it is quite natural for one to spontaneously deny a claim made upon him if it has in his belief no founda-

tion. In the other case there are various circumstances, like want of facility in writing or habitual delay in correspondence or press of business, which may tend to lead to the conclusion that silence is not acquiescence. The trial judge stated the rule rather broadly in this case, telling the jury that silence in respect to the statement in the letter "may amount to such an admission thereof as to justify a finding of its truth." The average juryman little comprehends the wide meaning of the word "admission" in the law of evidence. If a jury were told by the court, without explanation or qualification, that a party had admitted a certain fact, the jury would be quite likely to assume the fact established. Whether as an abstract statement of the law the instruction was correct or not, we are forced to the conclusion that, since it was accompanied with no explanation or caution and no reference to the other proof tending to explain the situation, it was erroneous. The charge ignored the testimony that *Kennedy* did reply as soon as he knew of the plaintiff's claim and the testimony of two witnesses that on the morning after the alleged contract he flatly denied that any had been made. There was a mass of conflicting testimony not only relating to the issue whether the contract was made but to other issues, and the failure to reply to this self-serving letter was singled out in the charge and the jury may well have believed that this fact alone would justify a finding for the plaintiff. In the former decision in this case the effect of the letters was limited as merely "tending to show the claims or admissions by silence or failure of denial of the parties." The most that could fairly be claimed as the effect of failure to answer the letter in question would be that it tended to corroborate the claim of the plaintiff and that it should be considered in connection with all the other facts and circumstances in the case. If *Kennedy* on November 21st made a denial that any contract had been made the evening before, he was under no obliga-

tion to make other denials. *Hinton v. Wells*, 45 Wis. 268; *Cobb v. Arundell*, 26 Wis. 553; 2 Chamberlayne, Evidence, § 1404.

Other parts of the charge were excepted to as improperly and unfairly emphasizing the testimony adduced by the plaintiff. The following are the instructions referred to:

"(1) In judging of intention where a person's unexplained and ambiguous acts and conduct are inconsistent with words, or claimed intent or understanding, the former are generally to be accepted as the more reliable guide as to his intention.

"(2) The acts and conduct of parties after the alleged making of an agreement should be considered in determining whether it was in fact made. Therefore, if after November 20, 1919, defendants proceeded as if they had succeeded to plaintiff's rights as a stockholder, officer, or manager of the Janesville News Publishing Company and exercised rights which he theretofore had as such, then such conduct on their part should be considered in determining whether the agreement claimed was made.

"(3) You may also take into consideration the acts and conduct of the plaintiff in canceling his checking signature, notifying the defendants thereof, and any other acts which he, to their knowledge, did in the way of relinquishing his rights or privileges as a stockholder, officer, or manager, or ceasing to further participate in the affairs of the company.

"(4) It is undisputed that the plaintiff shortly after November 20, 1919, the date of the alleged agreement, wrote the First National Bank of Janesville canceling his checking signature as an officer or manager of the Janesville News Publishing Company, and that defendants were advised thereof. It is also undisputed that he ceased to act as manager, or take any further steps or part in the business affairs of the company."

In the first part of these instructions the word "unambiguous" was doubtless intended instead of "ambiguous," but we do not regard the mistake as one which would be likely to have any prejudicial effect with the jury. It will be ob-

served that in the second and third of these instructions the court again laid stress on the testimony favorable to the plaintiff and ignored that adduced by the defendants. According to the weight of the evidence the defendants did not proceed, after November 20th, to act as if they had succeeded to the plaintiff's rights, but only after January 26, 1920, exercised such authority as was conferred at the stockholders' meeting of that date. By the third of these instructions the special attention of the jury was called to the subsequent conduct of the plaintiff deemed favorable to his cause, although neither here nor elsewhere in the charge was there any such allusion to circumstances corroborating the contention of the defendants. Among such circumstances were the following: the letter written by *Kennedy* denying the contract; the testimony as to *Kennedy's* denial of any contract on the morning of November 21st; the meeting of the stockholders within about two weeks after November 20th to consider whether they would buy; the fact that the defendants had never had any interest in newspapers and each had only a small interest in the new enterprise. There was a large amount of testimony in the case, much of which was in direct conflict, and it was a serious question on which side the evidence preponderated. If there was to be comment on the testimony by the court, or if the details were to be called to the attention of the jury, it should have been done impartially. We are convinced that the court failed so to do and that the error was prejudicial. In *Coman v. Wunderlich,* 122 Wis. 138, 99 N. W. 612, it is said:

"A trial judge should not, in charging the jury, give special significance to the evidence on one side of the controversy by speaking of it in detail, especially to those parts favorable to that side, while not mentioning the opposing evidence; nor should he so charge the jury as to refresh their memory as to what was testified to on one side of the controversy while not doing so as to what was testified on the other."

See, also, *Roys v. First Nat. Bank*, 183 Wis. 10, 197 N. W. 237; *Valley L. Co. v. Smith*, 71 Wis. 304, 37 N. W. 412.

The letter in question was the opening of a correspondence, not one written in the course of correspondence where mutual admissions are made. It was accompanied by no statement of an account, but was the plaintiff's self-serving statement that a special contract had been made. There are many decisions holding such unanswered letters inadmissible in evidence. See note in 8 A. L. R. 1161. When they are received it seems clear that instructions as to their probative effect should be carefully drawn. If they are not, although no bad motive is imputed to any party in this case, an energetic and over-sanguine or unscrupulous letter writer may write away the property or estate of those who are more careless or less facile in the use of the pen or who are unaware of the danger of remaining silent when they receive letters containing unfounded demands. *Mattocks v. Lyman*, 16 Vt. 113; *Moore v. Smith*, 14 Serg. & R. (Pa.) 388; 1 Greenleaf, Evidence, § 258.

Another assignment of error relates to the evidence of the witness Ladenberger. He testified that on the evening of the alleged sale the defendants went into the office of Jones and remained there for about an hour or an hour and a half; that thereafter he went into the office of Jones and talked with him, and among other things Jones said: "I am monarch of all I survey." Doubtless this was brought out for the purpose of corroborating the testimony of Jones and the plaintiff, but it was pure hearsay and no part of the *res gestæ*.

Other exceptions relate to the introduction of testimony and rulings during the trial, but since we believe that the errors already pointed out require that there should be a new trial we shall not discuss other exceptions. One of these is the claim that the court withdrew from the jury the question whether there had been a delivery and acceptance

of the subject of the sale. It is sufficient to say that on a new trial this issue should be submitted.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.