STATE of Wisconsin, Plaintiff-Respondent,

v.

Jason W. WRIGHT, Defendant-Appellant.†

Court of Appeals

*No. 94–3004–CR. Submitted on briefs June 9, 1995.—Decided July 26, 1995.*

(Also reported in 537 N.W.2d 134.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was on the brief of *Frederick P. Wilk* of Sheboygan.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Stephen W. Kleinmaier,* assistant attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J.  Jason W. Wright appeals his first-degree intentional homicide and aggravated battery convictions. We apply federal case law in deciding that a refusal to answer a specific question, as Wright did in this case, does not amount to an assertion of an overall right to remain silent. We also hold that police had probable cause to support Wright's detention at the police station. We further hold that one remedy a judge may employ to enforce a sequestration order is to exclude a witness from testifying; contempt is not the sole remedy allowed. We affirm the trial court.

Wright first submits that statements made by him while at the police station during an investigatory detention exceeded the original purpose of the detention, which was to secure physical evidence from his person. Wright posits that the statements should have been suppressed because they were gained as a result of unreasonable police conduct. But we agree with the trial court that police had probable cause to support Wright's seizure. The trial court's finding is supported by *Hayes v. Florida,* 470 U.S. 811, 815-16 (1985), which validates evidence gained during detention where police have probable cause to seize the suspect.

152

The facts showing probable cause are as follows: A neighbor of Wright's, G. Roger Olson, was found murdered in his home on the morning of August 4, 1993. Olson was found lying in a pool of blood and there were no signs of forced entry. A witness reported that, on the day before, he had seen Wright leaving Olson's apartment and saying, "I'll see you later, Roger." The witness also overheard both Wright and Olson say they would meet each other later that night. Another witness, who lived next door to Olson, reported that he heard an argument coming from Olson's apartment at about 4:00 a.m. on August 4.

Based on this information, investigating detectives went to Wright's home, about four residences away from the apartment building in which Olson resided. They arrived at about 9:30 a.m. The detectives immediately spotted blood outside Wright's door. The detectives knocked on the door and were let in by a brother of Wright's. While inside, one detective observed two red splotches of what he believed to be blood on the wall inside the house. The detective also saw what appeared to be blood on the wall at the top of the stairs; the blood was still red, not brown. Another spot of blood was observed at the top of the steps going into the kitchen just off the door.

The detectives had a conversation with all of the people present in the house. They asked if anyone knew Olson. Wright immediately answered that he did not know him and he did not know whom the detective would be talking about. However, Wright's father then stepped forward and said, "[W]e are not going to lie here, we do know Mr. Olson, he comes over to our residence and parks in front of our residence and talks to the boys on occasion." But when asked again if he knew Olson, Wright again denied knowing him.

When the detectives asked Wright where he was the night before, Wright replied that he was at a party. A detective noted that Wright was rubbing the left side of his eye and asked Wright what was wrong. Wright replied that he had been head-butted trying to break up a fight at the party. When a detective noted what appeared to be dried blood on Wright's left hand and on the inner portion of his elbow, Wright replied that it was the rowdiest party he had ever attended with "blood all over." He said that the blood got on him because one of the fighters, Eddie Gamez, was bleeding.

One of the detectives told Wright that he would have to come with them so they could remove blood for a comparison and make a determination where it came from. When one of the detectives told Wright he would need his shoes, Wright's girlfriend brought him a pair which she extended to Wright. Wright denied that they were his shoes. When the girlfriend told Wright that they were the shoes he always wore, he stated that they were his work shoes and that he had not worn them in two weeks. He said he wanted his other shoes, but the girlfriend said that these were the shoes he always wore. Wright said that he wanted a pair of tennis shoes and the girlfriend retrieved those for Wright. One of the detectives examined the shoes the girlfriend had first brought out and they looked wet.

While Wright was detained at the police station, the detectives went to the courthouse to get a search warrant for Wright's home, for an examination of the dried blood on Wright's hand, to examine him for external injuries and fingernail scrapings and to obtain blood samples from the interior of Wright's body. They also contacted Gamez who said that while it was true that he had gotten into a scuffle (with his brother) at a

party, he was not aware of any blood at the party, even when Wright tried to break up the scuffle. The detective also noted that Wright had said that it had been at least two days since he had seen Olson.

Based upon this information, the police had probable cause from which they could have arrested Wright for Olson's murder at this point. Olson was found in a pool of blood following an argument at about 4:00 a.m. on August 4. There were no signs of forced entry, thus indicating that Olson knew his attacker. A witness saw Wright leaving Olson's apartment the day before and overheard the two say they would meet each other later that night. When police entered Wright's home, they saw what appeared to be blood. They saw blood on Wright's person. When police asked whether anyone knew Olson, Wright twice denied it. He later admitted knowing Olson but claimed that he had not seen Olson in two days. When the girlfriend brought his shoes, Wright claimed that they were not his shoes and then claimed that they were his work shoes and he had not worn them in two weeks. Inspection revealed that they appeared to be wet. Finally, Gamez denied that blood resulted from the scuffle with his brother.

■ Wright's knowing the victim is consistent with the lack of forced entry; he lived close to the victim. His denials show a feeling of guilt. There was fresh blood at the murder scene, in Wright's home and on Wright's person. He lied about his shoes. The police had probable cause. As such, any statements made while in custody cannot be suppressed on the basis that they were an unreasonable extension of an "investigatory" detention to obtain blood samples. Besides, we have read the statements and they are totally exculpatory.

155

We see nothing in those statements which prejudiced him in his trial. We reject Wright's first argument.

Wright next complains that police did not scrupulously honor his having invoked his right to remain silent. The facts pertinent to this issue are: An officer was assigned to remain with Wright while the investigating detectives were at the courthouse obtaining the search warrants. This officer testified that Wright said "you tried to get me for speeding tickets one day and then a murder charge the next day." When the officer asked Wright when he last saw Olson, Wright said, "I'm going to do what that guy told me and plead the Fifth on that one." The "guy" referred to by Wright was a state public defender who had talked to Wright earlier and apparently told Wright not to talk to the police. Later, the investigating detective, apparently having returned from the courthouse, gave Wright his *Miranda* warnings and obtained a statement from him.

Wright maintains that the statement made to the officer, where he "took the Fifth" in response to the officer's question, was an invocation of his right to remain silent and that he should not have been questioned by the investigating detective. Aside from the fact that the statements were exculpatory and did not in any way prejudice Wright at trial, we hold that the trial court's decision not to suppress was correct and sustain it. The trial court ruled that Wright chose to remain silent only in respect to the one question asked by the officer assigned to look after Wright.

The law in the Ninth Federal Circuit is that a defendant may selectively waive his *Miranda* rights, deciding to "respond to some questions but not others." *Bruni v. Lewis*, 847 F.2d 561, 563 (9th Cir.) (quoted source omitted), *cert. denied*, 488 U.S. 960 (1988). The

First Circuit has arrived at the same conclusion. *United States v. Eaton*, 890 F.2d 511, 513-14 (1st Cir. 1989), *cert. denied*, 495 U.S. 906 (1990). We also find a United States Supreme Court case to be instructive. In *Fare v. Michael C.*, 442 U.S. 707, 726-27 (1979), a suspect declined to answer certain questions, claiming that he either did not know the answer or that he would not or could not answer specific questions. The Court ruled that the defendant's actions "were not assertions of his right to remain silent." *Id.* at 727. We agree with the State's reading of *Fare* that refusals to answer specific questions do not assert an overall right to remain silent. We decide to adopt the rule expressed in *Eaton* and *Bruni* and apply it to cases arising in this state.

Having done so, however, we add this caveat: Both *Bruni* and *Eaton* go on to hold that when a defendant's response is *equivocal*, in the sense that it indicates to the questioning officer that the defendant may want an attorney, the officer should not continue evidentiary interrogation. *Eaton*, 890 F.2d at 513; *Bruni*, 847 F.2d at 563. Thus, our adoption of the holdings expressed in *Eaton* and *Bruni* come with this limitation. In both the *Eaton* and *Bruni* cases, the statements were held to be unequivocal expressions of selective invocation. In *Eaton*, the defendant said that he would answer the questions he thought were appropriate. *Eaton*, 890 F.2d at 514. In *Bruni*, the defendant said he would answer those questions that "he felt good to answer or that he thought his attorney would probably advise him to answer." *Bruni*, 847 F.2d at 564. Likewise, here, we hold that the statement made by Wright was an unequivocal expression of selective invocation. Wright was asked a specific question and answered that he would do what his lawyer told him and plead the Fifth

157

*"on that one."* We determine that any reasonable thinking person would construe Wright's statement to mean that he was not going to answer *that specific* question. We reject Wright's argument.

The final issue is whether the trial court had authority to exclude a witness from testifying rather than holding the witness in contempt. The facts relating to this issue are that Frederick Honold had been mentioned by the prosecutor in his opening argument as one of the people who were potential witnesses. The prosecutor explained that they were not necessarily witnesses who would be called by the State, but he said he was reading the names to learn if the jurors knew them. The State did not call Honold. On the day before the last day of trial, Wright's counsel indicated to the court that he intended to call Honold to the stand. The prosecutor commented that Honold had been sitting in the courtroom throughout the trial. Wright's counsel responded that he had decided the day before to call Honold as a witness and that he had assumed that the State itself was going to call Honold. The prosecutor replied that he never indicated that Honold was going to be a witness for the State. The trial court warned that it might preclude Honold from testifying.

On the next day, Wright's counsel provided an offer of proof that Honold would testify about hearing some younger voices arguing on the night of the murder. Honold would also testify that he knew about Olson keeping guns in the house and about Olson's general habits and characteristics. Honold told the court that he had been in court most of Monday, half of Tuesday and an hour on Wednesday during the trial. Honold was being called as a witness on Thursday.

The trial court excluded Honold from testifying. It noted that the sequestration order had been entered at

Wright's request. It further noted that Wright knew about Honold's existence and his statements to the police. The court then stated that it was Wright's duty to make sure that Honold was not present in court if there was a chance that the defense would rely on Honold's testimony. The court also stated that it could not determine whether Honold had "picked up" on other testimony or not.

Wright claims that *Loose v. State,* 120 Wis. 115, 97 N.W. 526 (1903), is the controlling precedent on the remedy for violating sequestration orders. He argues that the case stands for the proposition that where a witness is put under a sequestration order and violates it, punishment for the transgression is confined to the witness himself, as for contempt. Wright further cites *Loose* to say that it is no ground for excluding the evidence if the party calling the witness is innocent in the matter. He argues that his trial counsel was innocent.

While Wright's recitation of *Loose* is correct, his reliance on it is misplaced. *Loose* is confined to the situation where the party intent on calling the witness is innocent in the matter but the witness has violated a sequestration order, either intentionally or otherwise. *Id.* at 120, 97 N.W. at 528. In that instance, the court wrote:

> An innocent party should not be deprived of the testimony of one of his [or her] witnesses because of the latter's transgression of which such party is innocent. Such transgression may well bear on the credibility of the witness' testimony, as has often been held, many of the cases cited being examples of that, but the direct punishment for the offense should be visited upon the offender himself, as for a contempt of court . . ..

159

*Id.* at 121-22, 97 N.W. at 528. Thus, for *Loose* to apply, two conditions must be present: (1) the witness must be the transgressor of the rule and (2) the party wishing to call the transgressor is innocent of violating the rule.

Here, Wright satisfies neither condition. Honold never knew he was a witness until he was subpoenaed late in the trial. He can hardly be called a transgressor of a rule that did not apply to him. Second, the trial court found, and we sustain that finding, that Wright himself should have kept Honold from the courtroom if he had any foreseeable belief that he would call Honold as a witness on his behalf. We add to this that the prosecutor never told the jury that Honold was going to be a State's witness. Rather, he told the jury that Honold was a potential witness although the State did not necessarily plan on calling him. This statement should have alerted Wright at that point to protect himself by making sure that Honold was not present in court.

Since this is not a *Loose* case, the controlling case on the issue is *Nyberg v. State,* 75 Wis. 2d 400, 409-10, 249 N.W.2d 524, 528-29 (1977). Exclusion from testifying is a remedy that is left to the discretion of the trial court. The trial court properly exercised its discretion on this issue.

*By the Court,*—Judgments affirmed.