COURT OF APPEALS
DECISION
DATED AND FILED

April 30, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2025AP495-CR**

Cir. Ct. No.  **2017CF1899**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

DAMETRIUS A. REEVES,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County: ELLEN K. BERZ, Judge. *Affirmed*.

Before Graham, P.J., Nashold, and Taylor, JJ

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM.　Security camera footage captured the images of two masked men as they shot and killed one man and severely injured another. Police later identified one of the shooters as the defendant, Dametrius Reeves, and the other as Reeves's friend, Curtis Langlois.　A jury found Reeves guilty of first-degree intentional homicide, attempted first-degree intentional homicide, and possessing a firearm as a felon.　Reeves appeals his judgment of conviction and the order denying his motion for postconviction relief.

¶2　On appeal, Reeves argues that he is entitled to a new trial because his right to confront witnesses was violated when the prosecutor introduced Langlois's testimonial statements at trial; the circuit court excluded testimony from an alibi witness that would have placed him away from the scene of the shootings; the prosecutor made improper closing arguments; the court provided the jury with an exhibit during deliberations that the jury did not request; and trial counsel was ineffective by failing to object to some of the above errors and by failing to present certain video evidence at trial that Reeves contends was favorable to his defense.　We conclude that any errors that were made at trial were harmless, that Reeves's trial counsel was not constitutionally ineffective, and that Reeves is not entitled to a new trial in the interest of justice.　We therefore reject Reeves's arguments and affirm.

## BACKGROUND

¶3　The events that led to the shootings in question began at a bar on Madison's near south side one evening in August 2017.　Reeves and Langlois were at the bar with their girlfriends; also present were the victims, the decedent

Kendrith Young and "A.B."[1] According to multiple witnesses who were present at the bar that night, there was tension between the two groups.

¶4 There were security cameras inside the bar and in its parking lot, and the cameras captured the following on video. Reeves, who drove a Chevy Malibu to the bar that night, was wearing a distinctive black and white t-shirt with the word "Hustle" on it, white jeans, black shoes with white soles, and a large wristwatch. Around midnight, Young and A.B left the bar and exited the parking lot in Young's vehicle. Shortly thereafter, a vehicle that resembled Reeves's Malibu also exited the parking lot and appeared to be following Young's vehicle.

¶5 Minutes later, Young and A.B. arrived at a nearby gas station, where they were again captured on security footage. That footage depicts the following.

¶6 Young's car pulled into the gas station, followed by a Malibu. As Young and A.B. exited their car and entered the convenience store, the Malibu traveled to the back of the store, outside of the range of the security cameras. About a minute later, two men—one fully masked and one partially masked—appeared in the frame, walking from the direction that the Malibu had been traveling. The fully masked man, who had a similar skin tone and build as Reeves, was wearing a black and white t-shirt with the word "Hustle" on it, black shoes with white soles, and a large wristwatch. Unlike the surveillance images of Reeves from the bar, the fully masked man depicted on the gas station surveillance footage was wearing pants that were black rather than white.

---

[1] We refer to the deceased homicide victim by his real name and the living attempted homicide victim using initials that do not correspond to his real name. *See* WIS. STAT. RULE 809.86 (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

¶7      The two masked men ran towards the entrance of the store and took a position near the entrance, where they were concealed by a wall. Young exited the store at 12:12 a.m. The masked men approached and fired shots at Young and into the store at A.B. before fleeing the scene.

¶8      Within days, police identified Reeves and Langlois as suspects in the shootings based on the security video footage. The State charged them with first-degree intentional homicide of Young and attempted first-degree intentional homicide of A.B., both by use of a dangerous weapon and as a party to a crime. The State also charged them with possession of a firearm by a felon. Langlois entered a guilty plea, leaving Reeves as the sole defendant who proceeded to trial.

¶9      The jury trial was held over several days in May 2019. We provide a general overview of the evidence and arguments that were presented at trial in this background section, and additional detail as needed in the discussion section.

¶10     At trial, the State argued that Reeves was the fully masked shooter who had committed the crime with Langlois. The State introduced video footage and still images from the security cameras at the bar and the gas station, as well as some physical evidence and cell phone records that were consistent with Reeves's involvement in the shooting. The State also called a number of witnesses, including A.B., the woman who had been Reeves's girlfriend when the shootings occurred, and a person who had been housed with Reeves in jail. A.B. testified about the night of the shootings and identified Reeves and Langlois as the shooters. Reeves's former girlfriend and the jailhouse informant both testified about conversations they had with Reeves following the shooting, in which Reeves made a number of incriminating statements including confessing to killing Young.

¶11   The State also called Langlois as a trial witness. Langlois declined to take the oath and likewise declined to answer any of the prosecutor's questions, including questions about statements that Langlois had made to police. Reeves's trial counsel objected to any questions concerning Reeves on confrontation clause grounds, but the circuit court initially allowed the questioning to continue. After Langlois said nothing in response to the prosecutor's questions about statements Langlois had purportedly made to police about Reeves possessing a gun, trial counsel renewed his objection, and the court determined that Langlois would not be allowed to continue to testify. It then instructed the jury to disregard "any statements that either counsel made regarding what Mr. Langlois may or may not have said," which "cannot be considered by you as evidence."

¶12   Reeves testified at the trial, and his defense was that he was not present at the gas station when the shootings occurred and that the masked man depicted in the security footage with Langlois was someone else. Specifically, Reeves testified that he had given Langlois permission to use his Malibu that night and, prior to turning the Malibu over to Langlois, Reeves had taken his "Hustle" t-shirt off and put it in the trunk of the car. Reeves further testified that he and a friend, Roy Yoakum, had gotten together so that Reeves could sell Yoakum a printer, and at the time the shootings occurred, Reeves and Yoakum were driving around Madison's near south side in Yoakum's car. In sum, Reeves asked the jury to infer that his Malibu was at the crime scene not because Reeves was there but because he lent the Malibu to Langlois; that his cellphone pinged in the area near the gas station before and after the shootings not because he was one of the shooters but because he and Yoakum happened to be driving close by at that time; and that the masked man pictured in the security footage was wearing his "Hustle"

t-shirt not because that man was Reeves but because Reeves had left the shirt in the car, making it available for the unidentified masked man to wear.

¶13    Reeves had intended to call Yoakum as an alibi witness who would have supported this version of events.  More specifically, in the pretrial notice that Reeves filed pursuant to WIS. STAT. § 971.23(8), he represented that Yoakum would testify that Yoakum picked Reeves up at an apartment that was near the bar and drove Reeves to another location on the near south side that was close to the gas station.  However, the State moved to exclude Yoakum's testimony on the ground that Yoakum had violated the sequestration order that the circuit court had put in place during the trial, and over Reeves's objection, the court excluded Yoakum's testimony.

¶14    In closing arguments, the prosecutor alluded to Yoakum's absence at trial and to the lack of corroboration of Reeves's version of events.  The prosecutor also made certain representations about the car that Langlois was driving on the night of the shooting.  Reeves's trial counsel did not object to the prosecutor's comments, but Reeves takes issue with them on appeal.

¶15    During its deliberations, the jury asked to see some of the trial exhibits, including video footage of the shootings from a specific angle.  The circuit court played the requested footage of the shootings for the jury, and also played footage of the shootings from a different angle which the jury had not specifically requested.

¶16    The jury found Reeves guilty on all counts.  Following his conviction, Reeves moved for a new trial on the bases of trial errors and ineffective assistance of counsel, and also in the interest of justice.  Following a

*Machner* hearing,[2] the circuit court denied Reeves's motion in a thorough written order. Reeves appeals.

## DISCUSSION

¶17    On appeal, Reeves contends that there were errors made during the course of the trial proceedings that warrant reversal; that his trial counsel was constitutionally ineffective; and that he is entitled to a new trial in the interest of justice. We address each of these issues in turn.

### I. Trial Errors

¶18    Reeves alleges that there were four errors during the trial that warrant a new trial: (1) the circuit court allowed Langlois's out-of-court statements to be introduced through the prosecutor's questioning even though Langlois was not available for cross-examination; (2) the court excluded testimony from Yoakum that would have supported Reeves's alibi; (3) the prosecutor made comments during closing arguments that were improper; and (4) in response to the jury's request during deliberations to view one video exhibit, the court also offered to play a video exhibit for the jury that it did not request. The State disputes that any of this constitutes error and also contends that, to the extent that Reeves has proven any error, the error was harmless. We evaluate the four alleged errors in turn.

---

[2] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). A *Machner* hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain [counsel's] handling of the case." *State v. Balliette*, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

### A. Langlois's Statements and Reeves's Confrontation Right

¶19    We begin with additional background about the prosecutor's direct examination of Langlois.  As noted, Langlois remained silent throughout and refused to answer any of the prosecutor's questions.  Reeves's trial counsel objected to any questioning about Reeves and asked the circuit court "to order the State not to ask about Mr. Reeves."  Counsel argued that if the prosecutor was allowed to ask about statements Langlois made to police that implicated Reeves, the jury would be able to infer that Langlois made those statements and, given Langlois's refusal to testify, Reeves would have no meaningful opportunity to cross-examine him.  The court initially overruled the objection and declined to give any such order.

¶20    When direct examination resumed, the prosecutor asked Langlois two questions about statements that Langlois had purportedly made to police about Reeves possessing a revolver.  It is this exchange that Reeves takes issue with on appeal:

> Q. … Mr. Langlois, do you recall being interviewed by the Wausau police …?
>
> A. (No response.)
>
> Q. Did you tell them that, "[Reeves] didn't buy the gun.  It was someone else that bought it for him.  Like I said, the pistol had been around for a minute, man.  The revolver had been around.  It was like that motherfucker had been around."
>
> [Defense Counsel]:  I'm gonna object.  It's hearsay.
>
> THE COURT:  Overruled.
>
> ….
>
> Q. Do you recall telling the Wausau police that Mr. Reeves had a revolver and it was a .38?

[Defense Counsel]: I'm gonna object again. Can we approach?

¶21 During a side bar outside of the presence of the jury, trial counsel renewed his request that the prosecutor not be allowed to ask Langlois any questions about Reeves. After reviewing case law and confirming that Langlois did not intend to answer any questions posed by either attorney, the circuit court determined that "no statements previously made by Mr. Langlois may be brought in" pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004), which addresses the Sixth Amendment's Confrontation Clause. *See* U.S. CONST. amend. VI. The court then gave the following curative instruction:

> Any statements that either counsel made regarding what Mr. Langlois may or may not have said to other people, any questions asked of Mr. Langlois that were not answered, which means, of course, all of them, cannot -- are not and cannot be considered by you as evidence. Moreover, you cannot draw any inferences from those statements of counsel or questions of counsel. Counsel's statements, counsel's questions, are not evidence.

¶22 On appeal, Reeves argues that the introduction of Langlois's out-of-court statements violated his confrontation rights. The Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. CONST. amend. VI. The general rule is that, with some exceptions that are not relevant here, the Confrontation Clause is violated when a witness's testimonial hearsay statements are admitted into evidence against a defendant without the witness appearing for cross-examination at trial.[3] *See Crawford*, 541 U.S. at 53-54, 59 n.9; *State v.*

---

[3] *See Crawford v. Washington*, 541 U.S. 36, 59 (2004) ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.").

*Rockette*, 2006 WI App 103, ¶20, 294 Wis. 2d 611, 718 N.W.2d 269. A witness "appears" for cross-examination when the witness is present at trial, takes an oath to testify truthfully, and answers questions asked by defense counsel. *See Rockette*, 294 Wis. 2d 611, ¶24. Whether a defendant's right to confrontation has been violated is a question of constitutional fact; we will "adopt the circuit court's findings of historical fact, unless they are clearly erroneous, but we independently apply those facts to the constitutional standard." *Id.*, ¶19 (citation omitted).

¶23 Here, Langlois's statements were not admitted into evidence. As mentioned, although the prosecutor asked questions alluding to Langlois's prior statements, the circuit court ultimately ruled that "[n]o statements previously made by Mr. Langlois may be brought in" and instructed the jury to not consider or make inferences about any statement that Langlois may have made.

¶24 Reeves nevertheless argues that, because the jury was exposed to Langlois's alleged statements to law enforcement through the prosecutor's questions, this was functionally the same as if the statements had been admitted. In support of this proposition, Reeves relies on *Douglas v. Alabama*, 380 U.S. 415 (1965), and *Bruton v. United States*, 391 U.S. 123 (1968). However, neither case squarely supports Reeves's argument that a confrontation clause violation occurred under the circumstances presented here.

¶25 In *Douglas*, 380 U.S. at 416, a co-defendant was called as a witness at Douglas's trial and invoked his Fifth Amendment privilege against self-incrimination. The prosecutor was nevertheless permitted to ask him questions, and in the course of those questions, the prosecutor read the entirety of the co-defendant's confession, which implicated Douglas. *Id.* Although the prosecutor's questions were not actually admitted into evidence, the Supreme Court determined

that this procedure violated Douglas's confrontation right. *Id.* at 420. The Court reasoned that the combination of the co-defendant's highly incriminating statements (which were the only direct indication of Douglas's guilt) and the co-defendant's invocation of the privilege against self-incrimination "created a situation in which the jury might improperly infer both that the statement[s] had been made and that [they] were true." *Id.* at 419. Here, by contrast, Langlois did not invoke his privilege against self-incrimination, and the statements the prosecutor read did not directly implicate Reeves in the shooting. To be sure, the rule from ***Douglas*** may have been implicated had the circuit court allowed the questioning to continue, but the court appropriately cut the direct examination short before more potentially incriminating details of Langlois's prior statements were conveyed to the jury.

¶26 Nor does ***Bruton*** help Reeves. *See Bruton*, 391 U.S. at 124. There, Bruton was tried jointly with his co-defendant. At trial, the co-defendant did not testify, but his confession was introduced into evidence. *Id.* The district court instructed the jury that it could consider the co-defendant's confession against the co-defendant, but not against Bruton. *Id.* at 125. When the case reached the Supreme Court, it held that Bruton was denied the right of confrontation notwithstanding the limiting instruction. *Id.* at 126. The Court reasoned that, "in the context of a joint trial," the risk that the jury would consider the co-defendant's confession in determining Bruton's guilt was too great to be cured by the limiting instruction. *Id.* at 129, 137. Again, the significant difference between ***Bruton*** and this case is that Langlois's statements did not directly implicate Reeves.

¶27 Reeves may instead be arguing that the circuit court erred by not taking action sooner to prevent the introduction of Langlois's alleged out-of-court statements. In other words, Reeves may be arguing that, instead of allowing the

11

direct examination to continue, the court should have taken any number of other actions that would have prevented the jury from hearing Langlois's alleged statements, such as by sustaining defense counsel's initial objection, granting counsel's request to order the prosecutor to not ask about Reeves, or halting the direct examination at an earlier point to determine whether Langlois would testify.

¶28    For the purposes of this appeal, we assume without deciding that the circuit court erred by not taking any of the above actions. But this is no small assumption in Reeves's favor—generally speaking, trial matters such as these are left to the court's discretion. *See, e.g.*, ***State v. Johnson***, 2004 WI 94, ¶9, 273 Wis. 2d 626, 681 N.W.2d 901 ("Whether the circuit court erred in permitting the questions … is a discretionary decision that we will not overturn unless the court's discretion was erroneously exercised."). Here, it was not necessarily apparent from the outset that Langlois would not respond to questions, and would therefore be unavailable for cross-examination. Accordingly, although it may have been a better course to attempt to discern whether Langlois would testify before allowing the prosecutor to ask him about Reeves, it was not necessarily unreasonable for the court to allow questioning to continue for a short spell under these circumstances.

¶29    But even assuming without deciding that the circuit court erred, we are persuaded by the State's argument that the error is harmless. WISCONSIN STAT. § 805.18(2)—better known as Wisconsin's harmless error rule—broadly provides that "in any action or proceeding," a judgment will not be reversed or set aside or a new trial granted unless "the error complained of has affected the substantial rights of [a] party." *See* **State v. Nelson**, 2014 WI 70, ¶29, 355 Wis. 2d 722, 849 N.W.2d 317 ("Wisconsin's harmless error rule" is found in § 805.18(2) and "is made applicable to criminal proceedings by WIS. STAT. § 972.11(1)."). Under this rule, an error is harmless if the party that benefited from the error (here,

the State) proves "beyond a reasonable doubt that the error … did not contribute to the verdict obtained," and that the jury "would have found the defendant guilty absent the error." *State v. Hunt*, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W.2d 434 (citations omitted). An error is considered "harmless" and will not warrant reversal if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *See State v. Harvey*, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted).

¶30      Here, as noted, the circuit court promptly gave a curative instruction, which directed the jury to disregard Langlois's alleged hearsay statements, and not to draw any inferences based on those alleged statements. *State v. Gary M.B.*, 2004 WI 33, ¶33, 270 Wis. 2d 62, 676 N.W.2d 475 (if a curative instruction was given, we presume that the jury followed that instruction). And importantly, the two hearsay statements that the prosecutor presented through questioning did not directly implicate Reeves in the shooting. Rather, the statements were about Reeves's ownership of a revolver, and that was not new information for the jury. Indeed, the jury had already heard testimony from Reeves's former girlfriend, who testified that Reeves told her that he owned a revolver and that she had seen him holding a revolver in her home. *See, e.g.*, *State v. Curbello-Rodriguez*, 119 Wis. 2d 414, 426, 351 N.W.2d 758 (Ct. App. 1984) (holding that the introduction of certain evidence was harmless because it was "merely cumulative" to other evidence). As we discuss at greater length below, the State's case against Reeves was strong, and under the circumstances here, it is clear beyond a reasonable doubt that the limited questioning of Langlois could not have tipped the balance in a way that changed the outcome of the trial.

13

## B. Exclusion of Yoakum's Testimony

¶31     As mentioned, the circuit court prohibited Reeves from calling Yoakum as an alibi witness at trial because Yoakum violated the sequestration order that was in place.  On appeal, Reeves argues that the court's ruling was erroneous and that it prevented him from presenting a defense.  We begin by providing some additional background regarding the testimony that Yoakum was expected to provide, his violation of the sequestration order, and the court's decision to exclude his testimony.

¶32     As noted, Yoakum was expected to testify that he picked Reeves up at an apartment that was near the bar and drove Reeves to another apartment in Madison that was not far from the gas station where the shootings occurred.  In addition to providing an alibi for the approximate time of the shooting, Yoakum's testimony would also support Reeves's claim that he was not in possession of his Malibu at the time it was captured on video in connection with the shootings, and would explain why his phone pinged close in time and place to the crime scene.

¶33     Yoakum's violation of the sequestration order occurred during a recorded call from jail that he made to his girlfriend the day before he was scheduled to testify.  Yoakum's girlfriend had been a spectator at the trial, and during the call, Yoakum asked about the testimony that one of the trial witnesses had given.  Yoakum's girlfriend responded that the witness testified that Reeves "didn't have the keys [to his Malibu] because somebody else had the keys."  Yoakum responded, "[T]hat's all I need to know.  Yeah, that's good.  Hell, yeah.… His alibi check[s] out.  Same alibi."  Yoakum also said that he hoped that Reeves would "beat this shit."

14

¶34 The State produced this recording the next day at trial outside of the presence of the jury. The parties did not dispute that Yoakum violated the sequestration order, which provided that "no witness shall, during the trial, speak to anyone about what another witness has testified." However, the parties disagreed as to whether it was appropriate to exclude Yoakum's testimony as a consequence for the violation.

¶35 The decision to exclude a witness from testifying is generally within the circuit court's discretion. *Nyberg v. State*, 75 Wis. 2d 400, 409-10, 249 N.W.2d 524 (1977), *overruled on other grounds by State v. Ferron*, 219 Wis. 2d 481, 496, 579 N.W.2d 654 (1998). However, discretion is not "the equivalent of unfettered decision-making." *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). To be sustained, a discretionary determination must be made based on the "appropriate and applicable law." *Id.*

¶36 As relevant here, the controlling law is our supreme court's decision in *Loose v. State*, 120 Wis. 115, 120-23, 97 N.W. 526 (1903). In that case, the court stated that "[a]n innocent party should not be deprived of the testimony of one of [the party's] witnesses because of the [witness's] transgression of which such party is innocent," and that "[s]uch transgression may well bear on the credibility of the witness'[s] testimony, … but the direct punishment for the offense should be visited upon the [transgressor], as for a contempt of court." *Id.* Accordingly, the exclusion of a witness's testimony based on the witness's violation of a sequestration order is not warranted unless "the party calling [the witness] is a guilty participant therein." *Id.* at 121; *see also State v. Wright*, 196 Wis. 2d 149, 159, 537 N.W.2d 134 (Ct. App. 1995) (the rule from *Loose* applies "where the party intent on calling the witness is innocent" of the witness's violation of the sequestration order).

15

¶37    Here, neither party brought the standard from *Loose* to the circuit court's attention, but the prosecutor alluded to its underpinnings. The prosecutor argued that, in his view, there was not "any realistic way to not attribute" Yoakum's violation to Reeves, and further argued that the State would be prejudiced if Yoakum was allowed to testify because "these witnesses are conspiring to tailor their testimony." According to the prosecutor, "the appropriate remedy" would be to prevent Yoakum from testifying. Defense counsel argued that excluding the testimony of his alibi witness would be extremely prejudicial to Reeves and took the position that cross-examination was the appropriate way to deal with the violation.

¶38    The circuit court concluded that "[t]he sanction for violating … sequestration is that [Yoakum] is prohibited from testifying." After defense counsel continued to object, the court proposed a compromise: Yoakum would be allowed to testify, and a stipulation would be read to inform the jury that Yoakum had violated the sequestration order by discussing trial testimony. The State opposed the proposed compromise and, over Reeves's objection, Yoakum was prohibited from testifying.

¶39    When making its decision to exclude Yoakum's testimony, the circuit court did not apply the standard from *Loose*. That is, the court did not analyze or determine whether Reeves was a "guilty participant" in Yoakum's violation of the sequestration order. *See Loose*, 120 Wis. at 121. And, based on our independent review, there are not sufficient facts in the record to support any such determination. *See Tralmer Sales and Serv., Inc. v. Erickson*, 186 Wis. 2d 549, 573, 521 N.W.2d 182 (Ct. App. 1994) ("We search the record for reasons to sustain the court's discretionary decision."); *Office of Lawyer Regulation v. Mutschler*, 2019 WI 92, ¶16, 388 Wis. 2d 486, 933 N.W.2d 99 ("When a court

16

does not make an explicit finding, an implicit finding may suffice, but only if the facts of record support it."). For these reasons, we conclude that the court erroneously exercised its discretion in excluding Yoakum's testimony.

¶40 The State makes three arguments to the contrary, none of them persuasive.

¶41 The State first argues for a different interpretation of *Loose*, specifically, that *Loose* permits but does not require admission when the witness has violated a sequestration order and the party calling the witness was innocent in the violation. In support, the State points out that in *Loose*, our supreme court affirmed the circuit court's discretionary decision to admit the witness's testimony. According to the State, *Loose* "should not be interpreted to mean that the circuit court would have … erroneously exercised its discretion if it had excluded the evidence."

¶42 We disagree. As shown above, although the *Loose* court affirmed the circuit court's exercise of discretion, it also unequivocally stated that "[a]n innocent party should not be deprived of the testimony of one of [the party's] witnesses because of the [witness's] transgression of which such party is innocent." *Loose*, 120 Wis. at 120-23. This unequivocal language does not appear to have been limited to the circuit court's exercise of discretion in that case, and instead appears to set forth a general rule disfavoring exclusion when the party calling the witness is uninvolved in the witness's violation of a sequestration order.

¶43 Second, the State argues that the record supports a finding that Reeves was in fact a guilty participant in Yoakum's violation of the sequestration order. The State relies on evidence that Reeves and Yoakum had a close

17

relationship and contends that several features of the conversation between Yoakum and his girlfriend—including Yoakum pressing for specifics about the witness's testimony, Yoakum telling his girlfriend that the details she recounted were "all [he] need[ed] to know," and Yoakum expressing hope for Reeves's acquittal—collectively prove Reeves's involvement in the violation.

¶44 We are not persuaded. The circuit court did not consider the issue of Reeves's involvement in the violation, much less make a finding that Reeves was a guilty participant. It is certainly possible that Reeves participated in some way in the violation of the sequestration order, but based on the facts known to the court, it is just as likely that Yoakum was freelancing. Apart from the existence of a friendship between Reeves and Yoakum, all of the facts that the State relies on are about Yoakum. The friendship, without more, does not demonstrate that Reeves was somehow involved in Yoakum's conduct, nor do the statements that Yoakum made during the call move the needle in this respect. At most, those statements indicate that *Yoakum* was interested in shaping his testimony to strengthen Reeves's alibi. The State does not point us to anything in the record that suggests that *Reeves* encouraged Yoakum to take such action, and any determination that he did would be based on nothing more than speculation.

¶45 Finally, to the extent that the State argues that the exclusion of Yoakum's testimony is proper because it was able to demonstrate that it would have been prejudiced by Yoakum's testimony given his violation of the sequestration order, we disagree. As the ***Loose*** court explained, any prejudice could have been remedied by impeaching Yoakum's credibility through cross-examination about the jailhouse call. ***Loose***, 120 Wis. at 121.

¶46     Having concluded that the circuit court erred when it excluded Yoakum's testimony, we consider whether the error was harmless. To that end, we consider the importance of the error in the context of the trial as a whole. *See State v. Monahan*, 2018 WI 80, ¶35, 383 Wis. 2d 100, 913 N.W.2d 894 (in "our application of the harmless error rule," we consider "the importance of the erroneously included or excluded evidence").

¶47     The State's evidence against Reeves was strong. Reeves admitted that he was with Langlois at the bar on the night of the shootings; that he had driven to the bar in his Malibu; and that he was the man depicted in the bar's security footage wearing a distinctive "Hustle" t-shirt, black shoes with white soles, and a large watch on his right wrist. The jury viewed security footage of the shootings, which depicted a masked man who was also with Langlois, was wearing the same distinctive shirt, shoes, and wristwatch that Reeves had been wearing in the footage from the bar, appeared to have the same skin tone and build as Reeves, and had arrived in what appeared to be the same car that Reeves had driven to the bar. The surviving victim identified Reeves as the shooter, and two witnesses, including Reeves's former girlfriend, testified that Reeves confessed to the shooting. The girlfriend also testified that Reeves had animosity towards Young and had threatened to kill him prior to the shooting. The State presented evidence that Reeves possessed the same kind of gun and the same kind of bullets believed to have been used by the masked shooter. It also presented information related to Reeves's cellphone, which suggested that Reeves was in the vicinity of the gas station before and after the shooting, and that one of the only times he was not active on his phone that night was at the time the shootings occurred.

¶48     On the whole, and keeping in mind that credibility determinations are reserved for the jury, the narrative of events that Reeves presented in his trial

testimony strained credulity. Among other things, Reeves would have the jury believe the reason that his car was at the crime scene was because he lent it to Langlois; the reason that his cellphone pinged in the area of the shootings was because he and Yoakum happened to be driving nearby to find Langlois so he could retrieve a printer from Reeves's vehicle; and the reason that the masked man pictured in the security footage was wearing Reeve's t-shirt was because the masked man must have found it in the trunk of Reeves's car. Moreover, as the circuit court found in its postconviction order, portions of Reeves's narrative were contradicted by the video evidence. A jury could reasonably have viewed Reeves's explanations for the inculpatory trial evidence with skepticism and concluded that they were contrived.

¶49 It is undeniable that Yoakum's testimony was important to Reeves's defense. It was consistent, at least to a degree, with Reeves's narrative and would have provided at least some corroboration for Reeves's account. In other words, had Yoakum testified, there would have been two witnesses rather than just one who testified that Reeves was driving with Yoakum in the vicinity at the time the shootings occurred.

¶50 At the same time, there are good reasons to doubt that Yoakum's testimony would have moved the needle in any appreciable way or made Reeves's alibi any more compelling. If Yoakum had testified, the circuit court would have instructed the jury that Yoakum violated the sequestration order by endeavoring to learn about testimony that another witness gave at trial. Yoakum also would have been subject to cross-examination about his close relationship with Reeves and his violation of the sequestration order, including through the introduction of the jail house phone call. Although the jury is always the ultimate arbiter of witness credibility, Yoakum's credibility, and thus the usefulness of his testimony to

Reeves's defense, is more likely to have been diminished rather than bolstered by the court's instructions and the prosecutor's cross-examination.

¶51     Accordingly, we conclude that it is "clear beyond a reasonable doubt that a rational jury would have found [Reeves] guilty," even if Yoakum's testimony had not been excluded.  *See* ***Harvey***, 254 Wis. 2d 442, ¶49 (citation omitted).

### C.  The Prosecutor's Closing Arguments

¶52     Reeves also takes issue with two aspects of the prosecutor's closing arguments.  Specifically, Reeves challenges the portion of the closing argument in which the prosecutor discussed Reeves's failure to call Yoakum as a witness, and he also challenges certain comments that the prosecutor made suggesting that Langlois did not drive a Cadillac to the bar on the night of the shooting.  According to Reeves, these comments amounted to prosecutorial misconduct.

¶53     A prosecutor is afforded "considerable latitude" during closing arguments.  ***State v. Bergenthal***, 47 Wis. 2d 668, 681, 178 N.W.2d 16 (1970). The prosecutor may "comment on the evidence, detail the evidence," and "argue from it to a conclusion."  ***State v. Draize***, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979).    However, a prosecutor's latitude to comment on evidence is circumscribed by an obligation not to ask jurors to draw inferences that the prosecutor knows or should know are not true.  ***State v. Weiss***, 2008 WI App 72, ¶15, 312 Wis. 2d 382, 752 N.W.2d 372.

¶54     Here, because defense counsel failed to object during the prosecutor's closing arguments, Reeves's claims about the prosecutor's comments are subject to the "plain error doctrine."  *See* ***State v. Jorgensen***, 2008 WI 60, ¶21,

310 Wis. 2d 138, 754 N.W.2d 77 ("The plain error doctrine allows appellate courts to review errors that were otherwise waived by a party's failure to object."). To demonstrate a plain error, Reeves must not only show that the prosecutor's comments constituted error, but that the error was "clear or obvious." *State v. Lammers*, 2009 WI App 136, ¶12, 321 Wis. 2d 376, 773 N.W.2d 463; *see also Jorgensen*, 310 Wis. 2d 138, ¶56 (Abrahamson, J., concurring). If Reeves meets this burden, the burden then shifts to the State to prove that the error is harmless. *Lammers*, 321 Wis. 2d 376, ¶14.

¶55 We begin with the prosecutor's comments about Reeves's alibi. During his closing argument, the prosecutor asked: "Where is this person who somehow can account for [Reeves's whereabouts]? Not here. Where is this close friend? Not here." During the postconviction proceedings, the State conceded that these comments "were likely inappropriate." The State's concession is warranted given WIS. STAT. § 971.23(8)(a), which provides that "the [S]tate shall not comment on the defendant's … failure to call some or any of the alibi witnesses." This comment by the prosecutor squarely concerned Reeves's failure to call an alibi witness and was therefore contrary to § 971.23(8)(a). We conclude that Reeves has met his burden to show that the comments were a "clear or obvious" error. *Lammers*, 321 Wis. 2d 376, ¶12.

¶56 Turning to the prosecutor's remarks about the car that Langlois drove to the bar on the night of the shootings, we begin by providing some additional background. At trial, it was established that Langlois consistently drove two different vehicles, a Cadillac he owned and his girlfriend's Buick. According to Reeves's trial testimony, Langlois drove his Cadillac to the bar on the night of the shootings and there were issues with its power steering. As best we understand it, although not explicitly stated in his testimony, Reeves may have

22

been trying to bolster the credibility of his narrative by suggesting that Langlois had a reason to borrow Reeves's Malibu that night, that reason being that Langlois was having mechanical trouble with the Cadillac he was driving that night.

¶57     At trial, there was some witness testimony about what car Langlois drove on the night of the shootings.  Reeves testified that Langlois drove the Cadillac, and Langlois's girlfriend testified that she did not recall which vehicle Langlois was driving.  It is not apparent from the record that any video or photographic evidence was presented at trial to show that Langlois drove his Cadillac to the bar that night.  However, based on the circuit court's postconviction decision, we understand that there was video evidence that the State produced as part of the discovery materials that would have supported that fact.

¶58     With this context, we turn back to the prosecutor's closing argument.  Reeves specifically takes issue with the following remarks:

> And you have this story about how [Reeves] lent his car to Mr. Langlois because Mr. Langlois'[s] Cadillac supposedly had power steering problems, despite the fact that, as [Langlois's girlfriend] told you, … they were using her Buick that night[.]…  What witness other than Mr. Reeves told you there was a Cadillac belonging to Mr. Langlois in [the] parking lot?

¶59     As Reeves correctly points out, the prosecutor misstated the testimony from Langlois's girlfriend.  We conclude that this constitutes clear and obvious error, given that the prosecutor should have known that this representation was not accurate.  *See Weiss*, 312 Wis. 2d 382, ¶15 ("Prosecutors may not ask jurors to draw inferences that they know or should know are not true.").

¶60 Reeves also contends that the prosecutor's comment was contrary to surveillance footage that was produced in discovery. As we best understand, Reeves is arguing that because the prosecutor knew or should have known that there was video footage depicting Langlois driving his Cadillac, it was improper for the prosecutor to ask the jury to infer otherwise. *See id.* As noted, the circuit court later found that this footage depicted Langlois driving a Cadillac, and the State does not argue that this finding was clearly erroneous. Accordingly, we conclude that the prosecutor knew or should have known that Langlois drove his Cadillac, and it was error to make comments to the jury that suggested otherwise.

¶61 Yet, here again, these errors were harmless beyond a reasonable doubt. The comments at issue were two passing remarks over a four-day jury trial, with dozens of witnesses and over one hundred exhibits. *See Monahan*, 383 Wis. 2d 100, ¶35 (relevant to the harmless error analysis is "the frequency of the error"). Under these circumstances, we are not persuaded that the jury was significantly influenced by either comment, especially given that the circuit court instructed the jury that the prosecutor's comments were not evidence. We presume that jurors follow jury instructions, which alleviates the risk that the jurors placed "any significant weight" on the prosecutor's remarks "other than the weight that came from their own independent examination of the evidence." *State v. Miller*, 2012 WI App 68, ¶22, 341 Wis. 2d 737, 816 N.W.2d 331.

### D. Unrequested Video Exhibit

¶62 Reeves's final assertion of error is that the circuit court erroneously provided the jury with a security footage exhibit of the shootings that it did not specifically request. We disagree.

24

¶63 By way of background, when the jury started its deliberations, the circuit court told the parties that it was "not going to send any [exhibits] back with the jury, and they can ask for what they want." Shortly after deliberations began, the jury asked about the evidence it could have access to in deliberations. The court responded that if the jury "encounter[ed] a need to review a particular exhibit or exhibits," the jury "should make a specific request" and the court would individually consider any such request.

¶64 The jury then made a number of requests to view particular exhibits. The requests included certain still photographs and video clips from security footage, including video of the shootings from a business next to the gas station "looking east." The circuit court and the attorneys watched the requested video to confirm that it would be responsive to the jury's request. After viewing the eastward-looking video clip, the court stated: "I don't think this is the one that they want to see. This is the one they're asking for. [But] I suspect it's not the one they want to see." The court asked the prosecutor to "also have at the ready the one looking west." The court and attorneys then viewed that particular clip and agreed that it would also be responsive to the jury's request.

¶65 The jury was brought back in, and the eastward-looking video clip of the shootings was played. The circuit court then stated that "[i]n the interest of efficiency," it had also "queued up the closer view" that was looking westward. The court acknowledged that it did not know if the jury wanted to see that clip and asked: "[R]ather than bringing you back if you go back to the [jury] room, does anyone need to see that?" Some jurors responded that they would like to view the westward-looking video clip that had been queued up, and the court played that clip for the jury. At no point did defense counsel object to the court offering to

play the additional video for the jury, which the attorneys had previously agreed was also responsive to the jury's request.

¶66    On appeal, Reeves argues that it was error for the circuit court to play for the jury this additional video footage that it did not specifically request. By offering to play this additional footage, Reeves argues, the court improperly weighed in on what evidence the jury should review.

¶67    The general rule is that "[i]t is within the circuit court's discretion to determine what exhibits are permitted in the jury room." *See State v. Jensen*, 147 Wis. 2d 240, 259-60, 432 N.W.2d 913 (1988).  However, the court should not give "special significance to the evidence on one side of the controversy," *see Mahoney v. Kennedy*, 188 Wis. 30, 43, 205 N.W. 407 (1925), and given that the judge is "a figure of authority and respect during the trial," an intrusion on the part of the judge into the jury's deliberations has the potential to "affect those deliberations," *see State v. Burton*, 112 Wis. 2d 560, 569, 334 N.W.2d 263 (1983), *overruled on other grounds by State v. Alexander*, 2013 WI 70, ¶25, 349 Wis. 2d 327, 833 N.W.2d 126.

¶68    Here, because defense counsel did not object to the circuit court providing the jury with the westward-looking video clip, Reeves must show that the court's action was a "clear or obvious" error pursuant to the plain error doctrine. *Lammers*, 321 Wis. 2d 376, ¶12.  This analysis is "akin to the ineffective assistance of counsel requirement" that the law must be "clear and settled" before an error will be deemed to be clear or obvious. *See, e.g.*, *State v. Nelson*, 2021 WI App 2, ¶48, 395 Wis. 2d 585, 954 N.W.2d 11 (2020) (citations omitted).

¶69    With this standard in mind, we conclude that Reeves has not met his burden to show that the circuit court's actions were a clear or obvious error. To be sure, courts should always be mindful of the sway their words and actions can have. However, under these circumstances, the mere act of asking a jury whether it wants to review a video exhibit that was related to its request, without more, is not per se improperly influential or intrusive, especially when both parties agreed that the video was responsive to the jury's request.

### E. Cumulative Error Analysis

¶70    Before concluding our analysis of the alleged trial errors, we briefly address the concept of cumulative error. This is because under circumstances in which more than one error occurred at trial, the cumulative effect of those errors, while harmless on their own, "may, in certain instances, undermine a reviewing court's confidence in the outcome of the proceeding." *State v. Harris*, 2008 WI 15, ¶110 & n.54, 307 Wis. 2d 555, 745 N.W.2d 397.

¶71    That is not the case here. We have explained why each of the trial errors that occurred was harmless on its own. And here, the same is true when the errors are considered cumulatively. Considering the staggering amount of incriminating evidence against Reeves, which we have merely scratched the surface in describing, we are convinced the jury would have found Reeves guilty if the errors had not been made. Therefore, we conclude that the State has met its burden to prove that these errors, whether viewed individually or cumulatively, were harmless and "did not contribute to the verdict obtained." *See State v. Hale*, 2005 WI 7, ¶2, 277 Wis. 2d 593, 691 N.W.2d 637.

## II. Ineffective Assistance of Counsel

¶72     We now turn to Reeves's ineffective assistance of counsel claim.  To prevail, Reeves must prove that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A defendant has the burden to prove both prongs of the *Strickland* test, and "[i]f the defendant fails to adequately show one prong …, we need not address the [other]." *State v. Elm*, 201 Wis. 2d 452, 462, 549 N.W.2d 471 (Ct. App. 1996).

¶73     Reeves argues that his trial counsel was ineffective for a number of reasons that are related to the claims of error that we have already discussed: for failing to instruct Yoakum about the rules surrounding the sequestration order, resulting in the exclusion of Yoakum's testimony; for failing to object to the prosecutor's improper closing arguments; and for failing to object when the circuit court provided the jury with exhibit footage it did not explicitly request.  Reeves also makes an additional argument concerning security video footage that counsel could have but did not present at trial.  As we now explain, none of these arguments have merit.

¶74     We begin with trial counsel's alleged failure to instruct Yoakum about the sequestration order.  During the *Machner* hearing, counsel acknowledged that he did not specifically recall telling Yoakum about the order; however, he also acknowledged that it was his "general practice" to inform witnesses about sequestration orders.  Based in part on this latter representation, the circuit court found that there was "no credible evidence" that counsel had failed to instruct Yoakum about the order.  Reeves argues this finding was clearly erroneous, but we need not resolve this factual dispute or decide whether Reeves

has met his burden to show deficient performance. Even assuming that counsel was deficient in this respect, Reeves has not persuaded us that he was prejudiced by counsel's alleged error.

¶75 To demonstrate prejudice, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Our supreme court has explained that in this context, the test for prejudice is "essentially consistent" with the test for harmless error, except that in ineffective assistance claims, the burden of proof is on the defendant rather than on the State. *See Harvey*, 254 Wis. 2d 442, ¶41; *State v. Dyess*, 124 Wis. 2d 525, 543-45, 370 N.W.2d 222 (1985).

¶76 Here, we assume that if counsel had informed Yoakum about the sequestration order, Yoakum would not have violated the order, he would have testified at trial, and his credibility would not have been undermined by cross-examination questions about his violation of the order. However, even if all these events came to pass, Reeves has not persuaded us that there is a reasonable probability of a different result. As noted above, the sequence of events that Reeves laid out, and that Yoakum presumably would have corroborated, was not all that compelling, and the jury would have had good reasons to doubt that account even with Yoakum's corroboration. *See supra* ¶48. This is especially true when the inculpatory evidence that pointed to Reeves being the shooter was overwhelming and when portions of Reeves's narrative were contradicted by video evidence. Accordingly, under these circumstances, we conclude that Reeves has failed to show prejudice.

¶77 Turning to trial counsel's failure to object to the prosecutor's comments during closing arguments and to the circuit court's decision to offer to play a video clip that the jury did not explicitly request, we also resolve both claims based on lack of prejudice. These alleged errors were hardly central to the issues at trial, and as discussed throughout this opinion, the evidence against Reeves was staggering. *See supra* ¶47.

¶78 Reeves makes one additional ineffective assistance argument concerning security video footage of the parking lot outside the bar, which was produced in discovery but not presented by counsel at trial. This video footage would purportedly have shown Reeves being dropped off in the parking lot around 12:53 a.m. to pick up Langlois's Cadillac. Reeves alleges that counsel was ineffective for not presenting this footage because it would have corroborated his trial testimony that he returned to the bar at that time and did not have his Malibu. He also argues that it would have corroborated his account that he changed out of the "Hustle" t-shirt that he had been wearing at the bar but never changed out of his white pants.

¶79 We conclude that the failure to present this video footage did not amount to deficient performance. Although Reeves claims that the footage would have helped corroborate his version of events, the footage is dark and grainy, and it is not readily apparent that the man depicted in the video is Reeves. But even if the jury were to credit that the man in the video was Reeves, it is not at all clear that the video footage would have helped Reeves's defense—in fact, it could just as easily have bolstered the prosecution's case. Although the video footage may have been consistent with the narrative that was set forth in Reeves's testimony about driving Langlois's Cadillac, it was equally consistent with the inculpatory narrative set forth by the State's theory of the case. That is, if Reeves and

Langlois drove to the gas station in the Malibu and shot Young and A.B. at 12:12 a.m., it would not be surprising that Reeves (or someone else) would have returned to the bar approximately 45 minutes later to pick up Langlois's Cadillac, which had been left behind. Given the minimal probative value to the footage to support Reeves's narrative and the fact that the jury could also view the footage as inculpatory, counsel was not deficient for failing to present it.

### III. New Trial in the Interest of Justice

¶80 Reeves also asks us to use our discretionary authority to grant him a new trial in the interest of justice. *See* WIS. STAT. § 752.35 ("In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment … as … necessary to accomplish the ends of justice."). We exercise our authority to reverse in the interest of justice "sparingly," and "only in the most exceptional cases." *See **State v. Schutte***, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469. Here, it is evident that the real controversy—whether Reeves was the masked shooter—was fully tried, and we are not persuaded that any of the errors made in Reeves's case were so fundamental that the use of our discretionary reversal power is warranted.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.